COCA–COLA BOTTLING COMPANY OF SHREVEPORT, INC.; Coca–Cola Bottling Company of Elizabethtown, Inc.; Owensboro Coca–Cola Bottling Company, Inc.; Texarkana Coca–Cola Bottling Company; Coca–Cola Bottling Company (San Angelo); Las Cruces Coca–Cola Bottling Company; The Coca–Cola Bottling Company of Tucson, Inc.; Jackson Coca–Cola Bottling Company; Wichita Coca–Cola Bottling Company; Permian Coca–Cola Bottling Company; Marshall Coca–Cola Bottling Co. Liquidating Trust Company; Coca–Cola Bottling Company of Tulsa, Inc.; Dixie Coca–Cola Bottling Company, Incorporated; New Bern Coca–Cola Bottling Works, Inc.; Magnolia Coca–Cola Bottling Company, Inc.; The Coca–Cola Bottling Company (Fort Smith); Coca–Cola Bottling Co. of Jamestown; Hattiesburg Coca–Cola Bottling Co.; Plymouth Coca–Cola Bottling Company, Inc.; Sacramento Coca–Cola Bottling Co., Inc.; Natchez Coca–Cola Bottling Co., Inc.; Central Coca–Cola Bottling Co.; Decatur Coca–Cola Bottling Co.; Coca–Cola Bottling Company of Williston (North Dakota); Richmond Coca–Cola Bottling Co., Inc.; Coca–Cola Bottling Company of Mt. Pleasant; Coca–Cola Bottling Co. of Muskegon; Mary Louise Goodrich; Mary Louise Kay Robinson, individually and as trustee of the Kendall family inter vivos trust; Ann Kay Hobson Haack, individually and as trustee of the Kendall family inter vivos trust; John K. Hobson; Margaret Dodge Hobson, individually and as trustee of the Kendall family inter vivos trust (Subst. for Natchez Coca–Cola Bottling Co.,

Inc.) Oliver C. Hutaff, Jr., as Trustee under Shareholders' Lawsuit Trust Agreement (Subst. for Wilmington Coca–Cola Bottling Works, Inc. and Kelford Coca–Cola Bottling Works, Inc.)

v.

The COCA–COLA COMPANY,

Arkansas–Georgia Company, Inc.; Central Coca–Cola Bottling Company, Inc.; Coca–Cola Bottling Company of Dickinson; Coca–Cola Bottling Company of Elizabethtown, Inc.; Coca–Cola Bottling Company of Jamestown; Coca–Cola Bottling Company of LaCrosse, Inc.; Las Cruces Coca–Cola Bottling Company; Love Coca–Cola Bottling Company; Magnolia Coca–Cola Bottling Company; Marshall Coca–Cola Bottling Company; Natchez Coca–Cola Bottling Co., Inc.; Plymouth Coca–Cola Bottling Co., Inc.; Sacramento Coca–Cola Bottling Co., Inc.; Coca–Cola Bottling Company (San Angelo); Coca–Cola Bottling Company of Shelbyville, Inc.; The Coca–Cola Bottling Company of Tucson, Inc.; Coca–Cola Bottling Company of Tulsa, Inc.; Coca–Cola Bottling Company of Williston; Oliver C. Hutaff, Jr., as Trustee under Shareholders' Lawsuit Trust Agreement (Subst. for Wilmington Coca–Cola Bottling Works, Inc. and Kelford Coca–Cola Bottling Works, Inc.), Appellants.

No. 91–3497.

United States Court of Appeals, Third Circuit.

Argued March 10, 1992.
Decided Feb. 17, 1993.

Jesse A. Finkelstein, Richards, Layton & Finger, Wilmington, DE, Emmet J. Bondurant, II and Jane E. Fahey (argued), Jeffrey D. Horst, Bondurant, Mixson & Elmore, Atlanta, GA for appellants.

Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Michael C. Russ (argued), George S. Branch, William F. Lummus, Jr., King & Spalding, Atlanta, GA, for The Coca–Cola Co.

Before: HUTCHINSON, ALITO and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

This is a companion to the case that is the subject of our opinion of even date disposing of the two consolidated appeals at our Docket Nos. 91–3496 and 91–3498, 988 F.2d 386. We will refer to that case as the "Coke case" and our opinion disposing of it as *Coke VIII.* We will refer to this case as the "diet Coke case" and to this opinion as *diet Coke VIII.* In *diet Coke VIII,* twenty bottlers appeal from the district court's final judgment denying them relief on all of their claims.[1]

---

1. There were two diet Coke actions filed in the district court, *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.,* 769 F.Supp. 671 and *Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.,* C.A. No. 83–120, 769 F.Supp. 671 (D.Del.1991). This appeal concerns only the *Shreveport* diet Coke action docketed in the district court as 83–95. The *Alexandria* diet Coke action, docketed in the district court as 83–120, was an action brought by two other bottlers. *diet Coke I,* 563 F.Supp. at 1123–24 n. 1 (Alexandria Coca–Cola Bottling Company, Ltd. and Coca–Cola Bottling of Presque Isle, Maine plaintiffs). The complaint of these two other bottlers in *Alexandria* included all of the claims brought by the bottlers in *Shreveport* and, as amended, an addi-

tional count. This additional count alleged that their contracts required the Company to provide them with diet Coke syrup at the price called for under a 1978 amendment to their contracts, *see Coke VIII* (explaining 1978 amendment), rather than the 1983 Temporary Amendment to the contract, *see infra* (explaining Temporary Amendment). *See diet Coke VII,* 769 F.Supp. at 715. The two bottlers who brought the *Alexandria* case were successful in winning injunctive relief, which would entitle them to diet Coke on the terms of the 1978 amendment and not the 1983 Temporary Amendment, *id.* at 737, but failed in their bid for monetary relief. *Id.* at 737–38. Neither side has appealed in the *Alexandria* case.

We have appellate jurisdiction over the district court's final order in this case. *See* 28 U.S.C.A. § 1291 (West Supp.1992). The district court had diversity jurisdiction over the bottlers' action in the diet Coke case. *See* 28 U.S.C.A. § 1332(a)(1) (West Supp. 1992).

The diet Coke case, like the Coke case that is the subject of *Coke VIII*, arises out of a dispute between The Coca–Cola Company (the "Company") and some of its bottlers over the scope of the bottlers' pre-existing contracts with the Company. The twenty bottlers who are parties appellant here in the diet Coke case, like the thirty who are parties appellant in the Coke case, refused to amend their contracts with the Company. The amendment proposed to them would have given them the right to bottle diet Coke in exchange for certain concessions. Thus, the question to be resolved is whether the bottlers' original contracts and the 1921 Consent Decrees (Consent Decrees) entered into between the Company and the parent bottlers in settlement of the same 1920 lawsuit we considered in *Coke VIII* include the right to bottle diet Coke. The district court ultimately held that diet Coke was not within the scope of these agreements.[2] In *Coke VIII*, we addressed the claims of a somewhat overlapping set of bottlers[3] concerning the Company's use of alternative natural sweeteners, namely high-fructose corn syrup (HFCS), to produce Coca–Cola Bottlers' Syrup. In *Coke VIII*, we affirmed the district court's holding that the contracts of that set of bottlers entitled them only to Coca–Cola bottling syrup sweetened with sucrose refined from cane or beet sugar and not HFCS. The district court interpreted the bottlers' contracts on the basis of findings concerning what the parties intended the ambiguous terms "sugar" and "syrup" to mean in the Consent Decrees settling the 1920 dispute over the price and quality of syrup. The 1920 litigation involved the Company and their so-called parent bottlers. *See Coca–Cola Bottling Co. v. Coca–Cola Co.*, 269 F. 796 (D.Del.1920) (*Coke 1920*). The bottlers who are parties to this case, like those who are parties to *Coke VIII*, rely on the rights of their parent bottlers in bringing suit. In *Coke VIII*, we held that the district court's findings on the meaning of "sugar" and Coca–Cola bottling "syrup" were not clearly erroneous. We further affirmed the district court's determination that the syrup the bottlers are entitled to under the Consent Decrees contains 5.32 pounds of cane or beet sugar per gallon of syrup. The same analysis applies to this case, and we are similarly unable to hold that the district court's find-

2. The opinions of the district court in the diet Coke case are *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, 563 F.Supp. 1122 (D.Del. 1983) (*diet Coke I*); *Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.*, 637 F.Supp. 1220 (D.Del.1984) (*diet Coke II*); *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, 107 F.R.D. 288 (D.Del.1985) (*diet Coke III*); *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, 110 F.R.D. 363 (D.Del.1986) (*diet Coke IV*); *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, 696 F.Supp. 97 (D.Del.1988) (*diet Coke V*); *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, 123 F.R.D. 97 (D.Del.1988) (*diet Coke VI*); *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, 769 F.Supp. 671 (D.Del.1991) (*diet Coke VII*).

3. The bottlers who are plaintiffs/appellants in this action are listed as follows (the state noted is their principal place of business and state of incorporation). Those who are also participating in *Coke VIII* have been indicated with an asterisk: Arkansas–Georgia Co., Inc. (AR); Central Coca–Cola Bottling Co., Inc. (VA); Coca–Cola Bottling Co. of Dickinson (ND)*; Coca–Cola Bottling Co. of Elizabethtown (KY), Inc.*; Coca–Cola Bottling Co. of Jamestown (ND)*; Kelford (NC) Coca–Cola Bottling Co., Inc.*; Coca–Cola Bottling Co. of LaCrosse (WI)*; Las Cruces (NM) Coca–Cola Bottling Co.*; Love Coca–Cola Bottling Co. (OK)*; Magnolia (AR) Coca–Cola Bottling Co., Inc.*; Marshall (TX) Coca–Cola Bottling Co.*; Natchez (MS) Coca–Cola Bottling Co., Inc.*; Plymouth (NC) Coca–Cola Bottling Co., Inc.*; Sacramento (CA) Coca–Cola Bottling Co., Inc.*; Coca–Cola Bottling Co. (San Angelo) (TX)*; Coca–Cola Bottling Co. of Shelbyville (KY), Inc.*; The Coca–Cola Bottling Co. of Tucson (AZ), Inc.*; Coca–Cola Bottling Co. of Tulsa (OK), Inc.*; Coca–Cola Bottling Co. of Williston (ND)*; Wilmington (NC) Coca–Cola Bottling Works, Inc.* *diet Coke VII*, 769 F.Supp. at 679–80; *Coke VII*, 769 F.Supp. 599, 605–06 (D.Del.1991). "The Las Cruces, Marshall, Natchez, San Angelo, Tucson, and Tulsa bottlers have each signed the 1983 Amendment and consequently seek past damages only." *diet Coke VII*, 769 F.Supp. at 680 n. 4.

ings in *diet Coke VII* were clearly erroneous. Consequently, we will affirm the judgment of the district court denying relief to the bottlers seeking a supply of diet Coke syrup.

Nevertheless, differences in the parties' arguments, the facts and the evidence, including the inferences that can be drawn from a preclusion order entered in *diet Coke IV* against the Company for failure to obey a discovery order and the effect of certain specific admissions the Company made that apply to the diet Coke litigation, require some separate exposition and analysis. Those differences and their effect on our legal analysis are the subject of this opinion. Otherwise, the evolution of the relationship between the Company and its bottlers is as set forth more fully in our opinion in *Coke VIII*, typescript at 10–23. We will not repeat those facts in any detail but will recite here only the undisputed facts specifically and additionally relevant to diet Coke.[4]

## I.

During the 1980's, the Company's product line proliferated. The Company intended one innovation, diet Coke, to counter the "narrow market appeal" of its existing diet product, Tab. *diet Coke I*, 563 F.Supp. at 1127. Because the diet soft drink market promised to expand by nearly one-hundred percent within the decade, and a ten percent gain in market share was estimated to translate into additional retail revenues of five billion dollars, "[o]n July 8, 1982, diet Coke was introduced with great fanfare." *Id.* With this introduction of diet Coke came a dispute over whether it was covered by the current bottling contracts.

The bottlers felt that the Company was obligated to provide diet Coke under the terms of their existing contracts. The Company, however, asserted that diet Coke was not within the scope of the existing contracts and proposed developing a new flexible pricing contract to cover it. *diet Coke V*, 696 F.Supp. at 103.

On October 7, 1982, the Company proposed a Temporary Amendment to the bottlers' contracts which would govern the price of diet Coke pending final agreement on a permanent contract. *Id.* The Temporary Amendment was intended to be an interim measure. Most of the bottlers have accepted it. About 191 have signed the Temporary Amendment and another 181 bottlers, who have not actually signed, have agreed to its terms. *Id.* These 372 bottlers are receiving diet Coke syrup and are marketing diet Coke within their territories. The bottlers in this case have refused either to sign or accept the terms of the Temporary Amendment. They object to its Paragraph Nine which states that "[i]t is further agreed, however, that during the period this Temporary Amendment is in effect, the price of Coca–Cola syrup and beverage base for diet Coca–Cola as between the parties hereto shall be determined solely under this Temporary Amendment." *Id.* (quoting *diet Coke I*, 563 F.Supp. at 1127–29 (footnotes and quotations omitted)). Consequently, the Company has refused to provide diet Coke syrup or beverage base to these bottlers. *Id.*

Shortly after its introduction of diet Coke, the Company embarked on a new project:

> [I]n April, 1985, the Company announced that it would stop producing Coca–Cola under the existing formula ("old Coke") and immediately start producing "new" Coke, which, the Company proclaims, tastes even better than old Coke.... The secret ingredient in new Coke, called "7X–100," is different than the secret ingredient in old Coke, but it is still only known to a handful of individuals and is kept locked in a bank vault in Georgia. ... [I]n response to consumer demand, [the Company] announced in July, 1985, that it would bring back old Coke under the name "Coca–Cola Classic." The Company will now provide bottlers with two kinds of sugar-sweetened cola syrups—old Coke syrup, to be packaged as Coca–Cola Classic, and new Coke syrup.

---

**4.** Those facts, like the more general historical facts recited in *Coke VIII,* are taken, at times verbatim, from the district court's opinions in this case.

The Company has informed its bottlers that for the present, it will supply them with Coca–Cola Classic syrup under the terms of their contracts for Coca–Cola, but without prejudicing the Company's rights. . . .

*Id.* at 103–04 (quoting *diet Coke III,* 107 F.R.D. at 291).

Within the same general time frame of its introduction of diet Coke and new Coke, the Company also introduced four other types of syrup. In April of 1983, the Company introduced caffeine-free Coca–Cola and caffeine-free diet Coke. In 1985, the Company introduced Cherry Coca–Cola and diet Cherry Coke. These four new products supplemented the existing versions of Coca–Cola and diet Coke and were offered as additional syrups. Each of these syrups have always contained less than the 5.32 pounds of sugar refined from cane or beets per gallon of syrup that the Consent Decrees required. *diet Coke VII,* 769 F.Supp. at 687–88. In *Coke VIII,* we held that the syrup the bottlers were entitled to under the Consent Decrees contains 5.32 pounds of cane or beet sugar per gallon of syrup. As explained in our opinion in *Coke VIII,* the district court found in *Coke VII* that this type and quantity of sugar defined the term "Coca–Cola bottling syrup" as it was used in the bottling contracts based on the Consent Decrees.

Though the parties entered into separate letter agreements governing the bottling of caffeine-free Coca–Cola and Cherry Coke, no separate agreements were made with respect to caffeine-free diet Coke or diet Cherry Coke. *See diet Coke VII,* 769 F.Supp. at 687–88. The letter agreements for caffeine-free Coca–Cola and Cherry Coke provided that the new syrups would be supplied pursuant to either the bottlers' pre-existing unamended contracts or the 1978 Amendment,[5] depending on which governed the particular bottler's opera-

tions. *Id.* at 687. The letter agreements all contained the same reservation of rights paragraph, which read:

It being the intent and purpose of the Bottler and the Company that this letter and the agreement set out herein shall in no way prejudice or otherwise affect their respective rights and obligations under the Bottler's Contract . . . or from any other source, or the respective legal or equitable claims, the Bottler and the Company expressly stipulate that this letter and the agreement contained herein shall have no such effect.

*Id.* at 687.

## II.

The bottlers who claim that they are entitled to diet Coca–Cola syrup all rely on unamended bottling contracts [6] that license them, within their territories, to bottle and sell Coca–Cola under terms initially dictated by an 1899 national franchise the Company had originally granted a predecessor of the parent bottlers' licensors. That franchise was later amended and finally modified by the agreement between the Company and the bottlers' licensors, or "parent bottlers," that was incorporated into the Consent Decrees which settled *Coke 1920.* The bottlers who are parties to this appeal still operate under these pre-existing contracts. The Company takes the position that the only syrup the bottlers' unamended contracts entitle them to is syrup sweetened with sugar made from cane or beets at a price dependent on the cost of that kind of sugar. Consequently, it says the bottlers have no entitlement to diet Coke syrup.

The bottlers, claiming their contracts are not so limited, filed a five count complaint seeking relief from the Company's refusal to supply diet Coke syrup. They based

---

5. The 1978 Amendment proposed a substitute pricing formula for syrup. The proposal also provided that the savings resulting from use of a sweetener other than sugar in the syrup would be passed through to the actual bottlers. Approximately 97% of the bottlers signed the Amendment. They are referred to as the amended bottlers. *See id.* at 678.

6. Because this case does not involve the amended bottlers from the *Alexandria* diet Coke case, *see supra* note 1, this summary will omit the district court's holdings with respect to the amended bottlers.

their claims on their individual contracts (Count One) as well as violation of the Consent Decrees (Count Two), trademark infringement and trademark dilution (Counts Three and Four) and antitrust violations (Count Five). *See diet Coke VII,* 769 F.Supp. at 679. Like the bottlers in *Coke VIII,* the bottlers in *diet Coke VIII* claim that the Company is their fiduciary, and that the manner in which it proposed to market diet Coke was a breach of its fiduciary duty. *See id.* at 712–14.

The bottlers who are parties to this diet Coke case asked the district court "to issue a preliminary injunction which would allow them to purchase diet Coke syrup without waiving their interim rights." *diet Coke I,* 563 F.Supp. at 1130. Basically, the bottlers sought to enjoin the Company from offering diet Coke to bottlers willing to temporarily waive whatever rights to diet Coke syrup they might have under their existing bottling contracts by executing the so-called "Temporary Amendment." *Id.* at 1129–30. In *diet Coke I,* the district court denied the bottlers' motion for a preliminary injunction. *Id.* at 1124. The district court concluded:

> While the phrase "standard Bottlers Coca–Cola Syrup" is also undefined in the corpus of the 1921 Consent Decrees, it seems clear that the syrup must contain 5.32 pounds of sugar [per gallon]. Since diet Coke syrup contains absolutely no sugar, *a fortiori,* it is not likely to be encompassed by the contractual phrase Bottler's Coca–Cola Syrup as employed by the 1921 Consent Decree.

*Id.* at 1135 (footnote omitted). Accordingly, the district court held that the bottlers had not shown a reasonable probability of success on the merits under the bottlers' contracts, the Consent Decrees or trademark rights. *Id.* at 1135–36, 1139.

Nevertheless, after noting the chemical and taste differences between Coke and diet Coke, the district court concluded that:

> Given the Company's acknowledged goal of line extension of the Coke family of products, the blatant identification of diet Coke with Coke, and the commonality of the coveted Merchandise 7X [the secret Coke flavoring] to both products, the Court concludes that for at least some purposes diet Coke may be Coke and now turns to the question of the contractual definitions relevant to the claims of the amended and unamended bottlers.

*Id.* at 1134.

The district court went on to examine the bottlers' trademark rights. It concluded that the bottlers had the "exclusive right to use the trademark, tradename, and bottle in their exclusive territories." *Id.* at 1138. It also decided, however, that the Company had not abrogated this right. *Id.* at 1138. It held that the dissident bottlers had not demonstrated a likelihood of success on the merits of their claim that the law of trademarks compelled the Company to give them diet Coke syrup and precluded it from giving diet Coke syrup to the bottlers who agreed to the Company's temporary amendment. *Id.* at 1138–39.

*diet Coke III* concerned the unamended bottlers' motion to compel disclosure of several of the Company's secret formulae. *diet Coke III,* 107 F.R.D. at 289–90.[7] It was a significant victory for the bottlers. The Company took the position that Coke and diet Coke are two separate products, *id.* at 295, but the district court rejected its supporting argument that Coca–Cola syrup could be defined solely by its sweetener. *Id.* at 296. The district court also decided that the bottlers could not rebut the Company's "separate products" argument without knowing the precise ingredients of the syrups that the Company used to make the different varieties of Coca–Cola it was selling. *Id.* at 296. The court, therefore, ordered the Company to disclose several of its formulas.[8] *Id.* at 300. These formulas are "one of the best-kept trade secrets in

---

7. *diet Coke II* only concerned the bottlers who had agreed to the 1978 Temporary Amendment. They are not parties to this appeal. Therefore, it will not be further discussed. *See diet Coke II,* 637 F.Supp. at 1220–21.

8. The Company was ordered to produce the complete formulae for diet Coke, new Coke, old Coke, caffeine-free Coke and certain experimental low-fat colas. The Company was not ordered to produce the formulae for Tab and caffeine-free diet Coke. *Id.* at 297 & n. 6.

the world." *Id.* at 289. They are kept locked away in an Atlanta bank vault which may "only be opened upon a resolution from the Company's Board of Directors." *Id.* The court reasoned that the bottlers had shown the secret ingredients were relevant and material in determining the nature of the syrup the Company was obligated to provide under the 1921 contracts. A stringent protective order could avoid any potential harm from disclosure, especially since the disclosure would be made not to the Company's competitors but to parties who shared the Company's interest in protecting the secret formula for Coca–Cola. *Id.* at 296–99.

The Company did not comply with the disclosure order the district court entered in *diet Coke III.* The bottlers moved for sanctions in the form of an order pursuant to Federal Rule of Civil Procedure 37(b)(2)(C) striking the Company's answer and entering judgment in the bottlers' favor on Counts One and Two of their complaint alleging breach of contract and breach of the Consent Decrees. *diet Coke IV,* 110 F.R.D. at 366–67. The district court did not grant the sanction the bottlers requested. Instead, it entered a preclusion order that gave the bottlers "the advantage of every possible inference that fairly could be drawn from the formulae evidence sought." *Id.* at 369. The district court was unwilling to grant a preclusion order, "coextensive with the issues to which the withheld formulae evidence is relevant," *id.* at 369, because such an order would be the "functional[ ] equivalent [of] a default judgment." *Id.* at 369 n. 16. The district court sought to avoid this result because it concluded "[i]ngredient identity is not necessarily the same as product identity." *Id.* at 370.

Categories of evidence other than the formulae—such as taste identity, marketing history and strategy, consumer perceptions, and packaging—are urged by the Company as being relevant to the product identity issue. If the Company is correct in whole or in part, it may be able to overcome whatever showing could be made on the basis of the formulae evidence.

*Id.*

Under this order, the district court also precluded the Company from distinguishing different varieties of Coca–Cola bottling syrup solely on differences in the sweetener used. The preclusion order did permit the Company to rely on differences in the sweetener used in diet Coke and other Coke products that were concededly covered by the bottlers' contracts if the difference in those sweeteners was material to the fact questions set forth in the Company's preliminary statement of issues. *Id.* at 371–72. The order thus reduced the Company's arguments to three: the course of conduct of the parties, the effect of the Consent Decrees' requirement that the syrup contain at least 5.32 pounds of sugar per gallon, and the bottlers' own interpretations of the products their contracts covered. *Id.* at 372. The district court set forth the preclusion order in full as an appendix to its *diet Coke IV* opinion. *See id.* at 373–77.

The preclusion order established: the formula for diet Coke syrup was within the formulae for syrups that have been sold as Coca–Cola Bottler's Syrup, diet Coke was intended to resemble old Coke, and the formula . for diet Coke is more like the formula for old Coke and new Coke than the formula for any other version of Coca–Cola, including any of the experimental low-calorie colas. *Id.* at 374.

The preclusion order also established that diet Coke contained ninety-nine percent of the total number of ingredients in both old Coke and new Coke. *Id.* As for the term "Coca–Cola Bottler's Syrup" as used in the 1921 Consent Decrees, a wide variety of different syrups made with different ingredients were manufactured and sold to the plaintiffs as "Coca–Cola Bottler's Syrup" under their contracts since 1899. *Id.* The differences in the compositions and tastes of some of the earlier versions of Coca–Cola Bottler's Syrup sold to bottlers as Coca–Cola Bottler's Syrup between 1899 and 1980 were more significant and more noticeable to consumers

than any such differences between the syrup for diet Coca–Cola and the version of "Coca–Cola Bottler's Syrup" which was sold to bottlers under their contracts between 1980 and 1985, immediately prior to introduction of new Coca–Cola. *Id.* In addition, the ingredient differences between diet Coke syrup and Coca–Cola Classic syrup were less significant than the ingredient differences which existed between the syrup for Coca–Cola Classic and the syrup for new Coca–Cola that the Company has sold as "Coca–Cola Bottler's Syrup" since 1985. *Id.*

The order further established that prior to the Company's introduction of new Coca–Cola syrup in April 1985, all of the syrups which it formulated and sold to bottlers as "Coca–Cola Bottler's Syrup," including diet Coke (but with the exception of caffeine-free Coca–Cola), shared certain attributes. All were caramel colored, were colas, and were sold under the trademarks Coca–Cola or Coke for consumption as a beverage. *Id.* at 374. They all contained Merchandise No. 5, which is a flavoring compound that has been used in every version of "Coca–Cola Bottler's Syrup" produced since 1899. *Id.* at 374–75. They also contained Merchandise 7X which constitutes the core of the Coca–Cola formula and distinguishes Coca–Cola from other competing soft drinks. Merchandise 7X has been used without change in every version of Coca–Cola Bottler's Syrup sold since 1899, with the exception of caffeine-free Coca–Cola syrup which contains a modified version of Merchandise 7X and new Coca–Cola syrup which contains no Merchandise 7X. *Id.* at 375.

The preclusion order established that the caffeine-free Coca–Cola syrup does not contain kola nut extract, caffeine, or extract of vanilla, all of which have been ingredients in every previous version of "Coca–Cola Bottler's Syrup," and it uses a modified form of Merchandise 7X. *Id.* Nevertheless, caffeine-free Coca–Cola syrup is the same from the standpoint of chemical composition, ingredient composition, and formulae as the syrup which the Company was selling as "Coca–Cola Bottler's Syrup"

between 1980 and April 1985 (and which is now sold as Coca–Cola Classic syrup). *Id.*

Later, in *diet Coke V*, the district court inferred from the preclusion order additional facts about diet Coke syrup. It found that diet Coke syrup contains the same amounts of Merchandise 7X, Merchandise No. 5, vanilla extract, and caffeine as the version of Coca–Cola Bottler's Syrup sold from 1980 through 1985 (Coca–Cola Classic syrup). *diet Coke V,* 696 F.Supp. at 109. It also stated that the Company changed the other publicly-disclosed ingredients in diet Coke to counterbalance the taste difference caused by the low-calorie sweetener. *Id.* In addition, "the formula, compositional, taste, and other physical organoleptic distinctions" between diet Coke and classic Coke are much less significant and much less noticeable to the consumer than:

(a) the differences between Classic Coke and earlier versions of Coca–Cola Bottler's Syrup;

(b) the differences between new Coke syrup and the syrup for Classic Coke and previous versions of Coke;

(c) the differences (except for taste and organoleptic properties) between caffeine-free Coke syrup and Classic Coke syrup; and

(d) the differences between various versions of Coca–Cola Bottler's Syrup sold between 1899 and 1980.

*Id.* (quotations omitted).

Most significantly, perhaps, in *diet Coke IV* the district court inferred that the preclusion order had established that the syrup in new Coke is Coca–Cola Bottler's Syrup even though new Coke is

produced by an entirely new and different formula, with materially different ingredients (including secret ingredients), a materially different flavor profile, and a materially different taste than [Coca–Cola Classic]; and ... the syrup for new Coca–Cola also materially differs in all of the respects enumerated above from any earlier version of "Coca–Cola Bottler's Syrup" which defendant has ever produced....

*diet Coke IV,* 110 F.R.D. at 376. The district court adhered to this inference de-

spite a finding in *diet Coke V* that noted significant differences in ingredients between new Coke and old or Classic Coke. In *diet Coke V*, the court noted that new Coke's formula is not a modification of the original Coca–Cola formula because it does not contain Merchandise 7X, the most significant part of the original formula for Coke, and new Coke's secret ingredients are different from the secret ingredients in the original Coke formula. *diet Coke V*, 696 F.Supp. at 109. Thus, the use of different secret ingredients in new Coca–Cola gives new Coca–Cola a significantly different taste than the version of "Coca–Cola Bottler's Syrup" which was sold to bottlers from 1980 through April 1985. *Id.*

In *diet Coke IV*, the court further inferred that the preclusion order established that diet Coke is distinguished from new Coke, old or Classic Coke and caffeine-free Coke only by the type of sweetener used, and that the Company formulated diet Coke so as to replicate the taste and appearance of the three other Cokes listed above. *diet Coke IV*, 110 F.R.D. at 376. It also established that the secret ingredients in diet Coke, new Coke, and/or old or Classic Coke are identical and used in the same ratios. *Id.*

In response to the bottlers' second request for admissions served on the Company in November 1986, the Company replied that it was "willing to stipulate solely for purposes of this litigation if the plaintiffs so desire, that the bottle syrup for caffeine-free Coca–Cola [and cherry Coke] is Coca–Cola Bottle Syrup within the meaning of the unamended Coca–Cola Bottle Contract and the 1978 Amendment." *diet Coke VII*, 769 F.Supp. at 687–88 (citations omitted).

In *diet Coke V*, the district court was faced with cross-motions for summary judgment on the definition of Coca–Cola Bottler's Syrup for purposes of the bottlers' contract claims and the trademark and antitrust claims. *diet Coke V*, 696

F.Supp. at 110. On the trademark and antitrust claims, the court granted summary judgment to the Company. *Id.* at 122–32.[9] Although the district court thought that the bottlers' "perpetual, sole, and exclusive license to use a trademark is a right with a good many of the indicia of ownership," *id.* at 128, it concluded that "their rights under the mark must be evaluated in light of their contracts rather than by applying the Lanham Act." *Id.* at 129. The district court held that the bottlers' trademark claims failed mainly because there was no likelihood of confusion among the products. The fact that the Company and the bottlers were not competing with each other was also significant, *i.e.*, the Company was not attempting to sell or market diet Coke to anyone else within the territory covered by the dissident bottlers' contracts. *See id.*

As it did in the Coke case, the district court denied both parties' motions for summary judgment on the meaning of the product term Coca–Cola Bottler's Syrup. *Id.* at 121. After exploring various competing definitions the parties suggested, the court rejected the bottlers' argument that they were entitled to judgment as a matter of law because of the similarities that the preclusion order had established among all the varieties of Coca–Cola. The district court repeated its conclusion that the preclusion order did not decide the issue of product definition because Coca–Cola Bottling Syrup cannot be defined solely by reference to its chemical composition. *Id.* at 113 (citing *diet Coke IV*, 110 F.R.D. at 371 n. 20; *diet Coke I*, 563 F.Supp. at 1134).[10]

As in the Coke case, the final opinion in diet Coke, *diet Coke VII*, was issued by the second district judge who retried the case after the first became ill. *See diet Coke VII*, 769 F.Supp. at 675. By the time *diet Coke VII* was decided, only Counts One and Two, the bottlers' claims of breach

---

**9.** Because the district court's ruling on the antitrust claim is not at issue in this appeal, we will not discuss it further.

**10.** *diet Coke VI* is of minimal relevance to this appeal. It involved the Company's belated attempt to withdraw certain answers to requests for admissions. *See diet Coke VI*, 123 F.R.D. at 99. The district court denied the motion, *id.* at 108, and the Company has not appealed this ruling.

based on their pre-existing individual contracts and the Consent Decrees, survived. *Id.* at 679. Central to these claims was the issue of product definition left open in *diet Coke V. See diet Coke V*, 696 F.Supp. at 110–21.

The district court resolved this issue in favor of the Company and entered judgment for it on Counts One and Two. *See diet Coke VII*, 769 F.Supp. at 714. Basically, the court followed the same reasoning as it did in *Coke VII*, holding that the defining product term in the bottlers' contracts was the nature and amount of sweetener used to make the syrup. *Id.* at 714; *see also Coke VII*, 769 F.Supp. at 648–50. It offered this summary of its decision:

As has been stated, the Consent Decrees inform the unamended contracts. The Decrees require the Company to supply the bottlers with a syrup which contains 5.32 pounds of sugar per gallon of syrup. Sugar is the only ingredient of the syrup specified in either the unamended contracts or the Consent Decrees. [The first district judge], at plaintiffs' behest, ruled in *Coke III* that "sugar" as used in the Consent Decrees meant granulated sugar from cane or beet. Plaintiffs have not contested this ruling.[11] Nobody argues that aspartame or saccharin, the two sweeteners used in diet Coke, are "sugar" for purposes of the unamended contracts and Consent Decrees.

diet Coke has never contained 5.32 pounds of sugar per gallon. The fact that diet Coke has never contained the one and only ingredient specified by the plain language of the Consent Decrees and unamended contracts is powerful evidence that diet Coke does not come within the scope of "Bottlers' Coca–Cola Syrup" covered by the unamended contracts and Consent Decrees.

... The evidence of prior course of dealing and of the negotiations in 1920–21 support the inference arising from the language of the unamended contracts and Consent Decrees that 5.32 pounds of

sugar per gallon is a definitional characteristic of the syrup covered by the unamended contracts.

Much of plaintiffs' course of performance evidence is derived from actions taken by the Company during pendency of this and the related [*Coke*] litigations [*sic*]. Neither party's actions over the course of performance and especially over the course of this litigation withstands scrutiny. The course of performance and the positions with respect to the contracts taken by both sides may be charitably described as arbitrary, self-contradictory, and self-serving. Consequently, the Court's decision derives nothing from the fact that both sides have asserted contradicting and frequently changing positions during this and the [*Coke*] litigations.

In sum, based upon the evidence presented, the Court concludes that plaintiffs have not shown by a preponderance of the evidence that the Company breached the unamended contracts or the Consent Decrees when it refused to supply plaintiffs with diet Coke syrup under the pricing provisions of the unamended contracts.

The Court also finds that plaintiffs have failed to prove the existence of a fiduciary duty in relation to the trademark or syrup formula created by the unamended contracts. Despite plaintiffs' best efforts to characterize themselves as victims at the mercy of the Company's whims, the fact is that the plaintiffs are independent and for the most part very successful businesses. The evidence of the negotiations leading to the 1978 and 1983 Amendments and these plaintiffs' refusal to sign those amendments shows that plaintiffs do not repose a blind trust in the Company when it comes to matters affecting their bottom lines. The relationship between the parties is not that of trustee and beneficiary, but rather that of a mutually profitable business relationship.

---

**11.** The district court informed the parties that it would be willing to reconsider the earlier ruling on the definition of "sugar" made in *Coke III*, which was binding on the parties; however, neither party took up the court's offer. *See diet Coke VII*, 769 F.Supp. at 681.

*Id.* (footnote added). The bottlers have filed timely appeals from the district court's final judgment against them.[12]

## III.

■ The bottlers' main argument is that the district court improperly interpreted the contract and the Consent Decrees when it held that the unamended bottlers had the right to demand only syrups made with at least 5.32 pounds of sugar per gallon. This conclusion led the district court to hold that diet Coke, which contains no sugar, was outside the scope of the contracts and the Consent Decrees. That issue is largely controlled by the analysis we set out in *Coke VIII.* As the district court stated in *diet Coke VII:*

> So convincing is the plain language of the unamended contracts and the Consent Decrees, that the Court might have ended its analysis there. However, the fact that the description of the syrup covered was limited to only one ingredient plus the words "high grade" and "standard" persuaded the Court to examine the extrinsic evidence.

*diet Coke VII,* 769 F.Supp. at 714. Thus, the diet Coke bottlers' success on their argument concerning product definition depends on their contention that the district court failed to give the preclusion order and the Company's admissions the conclusive effect that Federal Rule of Civil Procedure 36 commands. That argument raises a legal issue concerning the district court's interpretation of the rules. Therefore, we exercise plenary review. *See Int'l Union, UAW v. Mack Trucks, Inc.,* 917 F.2d 107, 110 (3d Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). The bottlers also maintain that the second district judge violated the doctrine of law of the case by failing to follow the

statement in *diet Coke V* that "the plaintiffs' interest in the mark will be a significant element in the final resolution of their contract claims." *diet Coke V,* 696 F.Supp. at 129. If there is a conflict, we review that issue for abuse of discretion. *See Schultz v. Onan Corp.,* 737 F.2d 339, 345 (3d Cir.1984). Whether a conflict exists is a legal issue subject to plenary review, although the district court's findings that form the basis of its conclusion that there was no likelihood of confusion are reviewed only for clear error. *See American Home Prods. Corp. v. Barr Labs., Inc.,* 834 F.2d 368 (3d Cir.1987).

### A.

■ In *diet Coke VII* the district court considered the impact of the admissions the Company made pursuant to Federal Rule of Civil Procedure 36(b).[13] *diet Coke VII,* 769 F.Supp. at 687–89. The bottlers contend that the district court erred by considering these admissions as mere evidence rather than as conclusive proof of the facts admitted. These admissions were separate from and in addition to the preclusion order. *Compare diet Coke VI,* 123 F.R.D. 97 (concerning request to withdraw admissions) *with diet Coke IV,* 110 F.R.D. 363 (concerning establishment of preclusion order).

The admissions do, however, reflect the scope of the preclusion order. The bottlers served them and the Company responded to them after the preclusion order was in effect. *Compare diet Coke VI,* 123 F.R.D. at 99 (request for admission served on November 19, 1986 and responded to on January 6, 1987) *with diet Coke IV,* 110 F.R.D. at 373 (preclusion order established on May 23, 1986). Although the bottlers and the Company disagree as to whether the district court correctly treated the admissions,

---

**12.** Coca-Cola Bottling Company of Elizabethtown and Wilmington Coca-Cola Bottling Works have also filed multiple petitions before the Trademark Trial and Appeal Board of the United States Patent and Trademark Office to cancel the Company's registrations for the trademarks diet Coke, diet Coca-Cola, and Coca-Cola. *See Coca-Cola Bottling Co. of Elizabethtown v. The Coca-Cola Co.,* Cancellation Nos. 17,851, 17,954, 18,981, 19,646 (T.T.A.B. filed

Nov. 14, 1988). The Board has suspended those proceedings pending determination of this appeal.

**13.** Rule 36(b) reads in relevant part:

Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission.

Fed.R.Civ.P. 36(b).

the district court held the admissions were not controlling on the question whether diet Coke is Coca–Cola Bottlers' Syrup under the Consent Decrees and the unamended contracts. Although none of the Company's admissions specifically cover that issue, the bottlers contend that taken together they negate all three theories of defense which were left to the Company after entry of the preclusion order.[14] Since the admissions establish that the bottlers' contracts include various "Cokes" which do not contain sugar, the bottlers argue that the Company cannot reasonably contend that the syrup used in diet Coke is not Coca–Cola Bottlers Syrup simply because it does not contain any sugar. The bottlers also maintain that the Company cannot contend that at any time there is only one "Coke" under the Consent Decrees and contracts since it has admitted that its contracts with the bottlers cover some of the newer varieties of Coke, in particular caffeine-free Coke and cherry Coke.

The Company's admissions do establish conclusively that its contracts with the bottlers covered Cherry Coke and caffeine-free Coke even though those varieties were unconceived when the 1921 contracts were made and the Consent Decrees that underlie those contracts entered. *See diet Coke VII*, 769 F.Supp. at 687–88. Thus, the bottlers contend that the parties' 1921 failure to foresee the possibility of an acceptable diet Coke when they entered into the Consent Decrees and contracts is immaterial in the face of the Company's admission that the 1921 contracts cover other varieties of Coke that have since been developed and were also unforeseen in 1921.

The Company maintains that its admissions are merely evidentiary in nature and that the inference the bottlers wish to draw from its admission that it has supplied these other varieties of Coca–Cola under bottling contracts based on the Consent Decrees is unwarranted. It notes that the admissions all pertain to syrups sweetened with sucrose or fructose, while diet Coke is sweetened with aspartame or saccharin.[15] For the diet Coke bottlers to prevail in this action, it would be necessary to infer from the Company's admissions that syrups naturally sweetened with either fructose or sucrose as well as syrups artificially sweetened with aspartame or saccharin are included in the generic product, Coca–Cola. Thus, the Company maintains that the district court properly limited the conclusive effect of these admissions to the naturally sweetened varieties of Coca–Cola bottling syrup—new Coke, the Cherry Cokes, the Caffeine-free Cokes, and Coca–Cola Classic.

We agree with the Company that the district court correctly limited the Company's admissions to the specific syrups mentioned in the admissions. The admissions were only "evidence" that the Consent Decrees and contracts covered diet Coke syrup, a syrup not specifically mentioned in any of them. Nowhere in its admissions did the Company mention diet Coke or any syrup other than one sweetened with sucrose or fructose. Thus, this issue is not controlled by our statement in *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 803 (3d Cir.1992):

> that an admission of facts made under Rule 36 is an "unassailable statement of

---

14. The bottlers argued that the admissions eliminated the Company's defenses that (1) diet Coke could not be covered because it did not contain 5.32 pounds of sugar (the "absence of sugar" defense); (2) diet Coke was not covered by the contracts because it was offered in addition to, and not in lieu of, Coca–Cola and the contracts covered only "one Coke at a time"; and (3) because diet Coke was unforeseen in 1921, there could have been no "meeting of the minds" to cover this product and therefore the contract does not cover it. *See* Brief for Appellants at 31–33.

15. This observation might reasonably be thought inconsistent with the Company's argu-

ment in the Coke case. It is, however, only another example of the parties' shifts in position as they jockeyed for advantage during the course of this protracted dispute. Compare the original complaint of the bottlers in the Coke case that the Company's substitution of fructose-based syrup for sucrose-based syrup was a major breach of the bottlers' pre-existing contracts with their later claim that the contracts required the Company to supply them with the fructose-sweetened syrup that could be more cheaply produced at a reduced price reflecting that saving.

fact that narrows the triable issues in the case." *Airco Industrial Gases, Inc. v. Teamsters Health & Welfare Pension Fund,* 850 F.2d 1028, 1037 (3d Cir.1988). We have also held that Rule 36 admissions are conclusive for purposes of the litigation.... *Anchorage Associates v. Virgin Islands Board of Tax Review,* 922 F.2d 168, 176 n. 7 (3d Cir.1990). The admissions were not conclusive as to whether the 1921 contracts included diet Coke within their scope.

*Airco Industrial Gases, Inc. v. Teamsters Health & Welfare Pension Fund,* 850 F.2d 1028 (3d Cir.1988), is also distinguishable. There, the issue was whether the Fund had, as of July 1983, effected a no refund policy for employers who had over-contributed. *Id.* at 1030–31. The Fund, pursuant to Rule 36, admitted that it "agreed to adopt" a no-refund policy in November of 1983. *Id.* at 1035. Despite this admission, the district court found that the no-refund policy was adopted in March of 1981, well before Airco filed its claim. *Id.* On appeal we held that the district court in *Airco* erred in construing the admission to reaffirm a pre-existing no-refund policy because the Fund admitted that it *did not agree* to adopt the no-refund policy until November of 1983. *See id.* at 1036 ("[t]he admission is plainly worded, and does not refer to any previous decisions of the trustees"). We further emphasized that "[t]his admission is not merely another layer of evidence, upon which the district court can superimpose its own assessment of weight and validity." *Id.* at 1037. Because the district court's finding was contrary to the very language of the admission, we reversed. In short, in *Airco* we treated the Fund's admissions pursuant to Rule 36 as judicial admissions conclusive as to the facts admitted. We did not, however, extend their conclusive effect to any inferences that might be drawn from them.

The word syrup carries no hard and fast meaning nor can the meaning of this product term be clearly determined from its usage in the text of the submitted documents. Therefore, in that respect, the contract is ambiguous and accordingly, the district court's findings on the meaning the

parties intended to give to Coca–Cola bottling syrup and its consequent interpretation of that phrase cannot be set aside unless it is clearly erroneous. *See Painewebber Inc. v. Hartmann,* 921 F.2d 507, 510 (3d Cir.1990).

Here, unlike the court in *Airco,* the district court did not fail to give the Company's admissions the effect of judicial admissions. None of the Company's admissions concerned diet Coke, and none of the bottlers' requests for admissions asked whether Coca–Cola bottlers' syrup must contain a natural variety of sugar in order to come within the scope of the bottlers' contracts. Nor did the Company's admissions answer the question whether more than one "Coke" could exist at a time. Likewise, they did not deal with whether the 1921 contracts and Consent Decrees covered syrups other than sucrose-sweetened syrup, the only sweetener then suitable, or any other sweeteners then known, such as the saccharin that had been used before 1907. These questions were beyond the scope of the Rule 36 admissions the Company made in this case. While the admissions are conclusive as to the facts admitted, they are merely evidence on the ultimate fact of what defines the "syrup" the parties agreed on. Although the admissions reflect an expansion of the terms used in the 1899 agreement and the 1921 Consent Decrees, they do not conclusively establish the definitive characteristics of the products bargained for in those agreements.

Because the Company's admissions did not conclusively establish that the bottlers' contracts covered anything beyond syrup naturally sweetened with sucrose or fructose, the district court had the right to weigh the Company's admissions on the generic nature of its syrup against other evidence in the record, such as course of performance, to determine whether the bottlers' contracts also covered diet Coke syrup. *See diet Coke VII,* 769 F.Supp. at 709–11. Absent the admissions and the preclusion order we have set out above in Part II of this opinion, the district court's determination that the bottlers' contracts only covered syrup sweetened with sucrose would

control the meaning of the term syrup in this diet Coke case. Even with those admissions and inferences, the district court's determination that the 1921 contracts did not cover diet Coke syrup was correct for the reasons set out in *diet Coke VII*, 769 F.Supp. at 714.[16]

■ We are unable to say the district court's finding that the bottlers' contracts did not cover diet Coke syrup, a finding made after weighing the Company's admissions and the facts the preclusion order established against the other evidence, was clearly erroneous. All of the syrup varieties that the Company admitted were within the generic meaning of Coca–Cola bottling syrup and were naturally sweetened. All were also the subject of a letter from the Company expressly offering them to the bottlers as supplemental amendments to the 1921 contracts. Thus, the district court's finding that only sucrose-sweetened syrup is covered by the parties' contracts is not inconsistent with the broader definition of Coca–Cola bottling syrup that could be inferred from the Company's diet Coke admissions. The district court's conclusion is bolstered by the fact that the parties have never agreed on a price or composition for diet Coke. While the Consent Decrees clearly value sugar-based syrup, the agreements are silent as to the price of syrup based upon any other sweetener. Just as we were reluctant in *Coke VIII* to impose a judicially created price for a commodity unforeseen at the time of the contract (there HFCS-sweetened syrup of comparable quality), we are similarly reluctant to do so in the case of artificially sweetened colas. This is a task better left to the parties. *See Coke VIII*, typescript at 43–48.

In *Coke VIII*, we affirmed the district court's decision that the bottlers who are parties to that appeal are not entitled to Coca–Cola bottlers' syrup containing less than 5.32 pounds of sugar per gallon. We will also affirm the district court's conclusion that diet Coke is not covered by the Consent Decrees or the contracts.

### B.

■ We must still consider the bottlers' assertion that the second district judge violated the doctrine of law of the case as set forth in *diet Coke V* when he "rejected the bottlers' argument that they own an equitable interest in the Coca–Cola trademark as applied to the bottling business and that this ownership supports their claim that the contracts cover any bottling syrup using the trademark." Brief for Appellants at 36. Specifically, they rely on remarks by the first district judge in *diet Coke V* that "the plaintiffs' interest in the mark will be a significant element in the final resolution of their contract claims." *diet Coke V*, 696 F.Supp. at 129.[17]

In *diet Coke VII*, the second district judge held that the doctrine of law of the case did not apply because the first district judge's illness fell within that doctrine's exception "for situations wherein the original judge is unavailable to reconsider his decisions due to death, resignation, or disability." *diet Coke VII*, 769 F.Supp. at 703. The Company agrees but goes further and argues that the doctrine itself does not apply because the statements in *diet Coke V* that the bottlers rely on were not law of the case to begin with. The Company argues they are non-binding dicta made in the course of denying the bottlers'

16. For a full discussion of the reasons why the parties' 1921 contracts did not include any syrup other than syrup sweetened with sucrose, the reader is referred to *Coke VIII*, our opinion of even date disposing of the parties' appeal and cross-appeal of the Coke case.

17. The bottlers also set forth various other statements of the first district judge that were made in connection with the one quoted above in support of their position. *See diet Coke V*, 696 F.Supp. at 123 (in *Coke 1920*, "Judge Morris's

trademark analysis was central to his holding that the contracts ... were in fact perpetual"); *id.* at 124 (" 'the rights in good will and trademark name acquired under the contract by the bottlers were the same in character and as permanent as if [the Company] had sold to them an established bottling business with its trademarks and good will.' ") (quoting *Coke 1920*, 269 F. at 810)); *id.* at 126 ("[t]he proposition that the [bottlers] have an interest in the trademark is plain from the language of the transfer from the Company").

motion for summary judgment on their trademark claims. Essentially, it contends that only those statements that are part of the judgment create law of the case.

■ As we note in *Coke VIII*, the law of the case doctrine is a rule that is subject to the discretion of the court applying it. *See Coke VIII*, typescript at 60–61. Whether the doctrine or one of its exceptions is properly applicable is, however, subject to plenary review. *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 163 (3d Cir.1991) (plenary review of decision that action not barred by state entire controversy doctrine), *cert. denied*, — U.S. —, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). Thus, the decision to invoke the law of the case doctrine is discretionary only if the doctrine actually applies to the issue before the court. Accordingly, we will first address the threshold question whether the doctrine of law of the case applies at all. Only if it does so apply will it become necessary to examine the district court's use of it for abuse of discretion.

In *diet Coke V*, the district court granted the Company's motion for summary judgment on the trademark claims and denied the unamended bottlers' cross-motion. *diet Coke V*, 696 F.Supp. at 121–22, 130. There, the court examined the trademark issues and the Consent Decrees at length in an effort to determine the respective parties' rights in the marks. *See diet Coke V*, 696 F.Supp. at 126–29. It noted that the unamended bottlers' "perpetual, sole, and exclusive license to use a trademark is a right with a good many of the indicia of ownership," *id.* at 128, but never determined the actual scope of the bottlers' rights in the Coca–Cola trademark. *Id.* at 128–29.

The question presented and decided in *diet Coke V* was whether the bottlers licensed by the parent bottlers were beneficiaries who could recover on their trademark claims under the Lanham Act. *See*

*id.* at 129 ("Accordingly the plaintiffs' trademark claims, insofar as they are based on section 43(a) of the Lanham Act, as well as their anti-dilution claims, fail in essential respects."). At best, the district court's discussion of the bottlers' rights under the contract, as opposed to the Lanham Act, is *dicta*. The law of the case doctrine does not apply to the district court's later rejection of the bottlers' Lanham Act claims because it had not yet decided the bottlers' common law trademark rights under the contracts they had made with the parent bottlers. *See Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (law of the case doctrine applies only when court decides rule of law).

■ The bottlers reliance on our decision in *Todd & Co. v. SEC*, 637 F.2d 154, 157 (3d Cir.1980), for the proposition that any discussion of an issue can be the basis for application of the doctrine of law of the case is not persuasive. Even if *Todd & Co.* did stand for this proposition, it would no longer be good law under *Arizona v. California*. *Todd & Co.* does not, however, stand for such a broad proposition. The language in *Todd & Co.*, on which the bottlers rely, states that "the [law of the case] doctrine applies not only to issues that were actually discussed by the court in the prior appeal, but also to issues decided by necessary implication." *Id.* This statement refers only to issues that the court actually decided, whether expressly or by implication.[18] Later decisions of this Court are consistent with such a reading of *Todd & Co. See, e.g., Peoples v. Fulcomer*, 882 F.2d 828, 830 (3d Cir.1989) ("These conclusions are law of the case"); *Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 802 (3d Cir.1987) (*Todd & Co.* stands for the proposition "when an appellate court reverses in part and affirms in part, all issues necessarily disposed of in the affirmance become law of the case").[19]

**18.** Indeed, we cited the Supreme Court's then-recent decision in *Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979) and reproduced the quotation "issues

previously determined" in a parenthetical. *See Todd & Co.*, 637 F.2d at 157.

**19.** Our statement in *Castle v. Cohen*, 840 F.2d 173, 180 n. 10 (3d Cir.1988) that "the district

In *diet Coke V*, the first district judge granted summary judgment for the Company on the bottlers' Lanham Act claims because there was neither likelihood of confusion nor evidence that the Company diluted the trademark by marketing the other Coke products. *diet Coke V*, 696 F.Supp. at 129. The other language concerning the unamended bottlers' rights in the trademark and how they affect the unamended bottlers' contract claim is *dicta* which cannot be the predicate for a ruling that the doctrine of law of the case was violated.[20] Thus, the second district judge did not err in failing to accord law of the case effect to the first district judge's statements in *diet Coke V*.[21]

### C.

 In *diet Coke VII*, the district court also rejected the bottlers' claims that the Company owed them a fiduciary duty with respect to the trademark and tradename Coca–Cola because the 1921 bottling contracts created a trust for the benefit of the bottlers in the trademark or the secret formula. The court concluded that the parties never intended to impose on the Company a trust in the trademark or secret formula with the bottlers as beneficiaries. *See diet Coke VII*, 769 F.Supp. at 712. It is all too plain that the bottlers were unwilling to place their trust in the Company in 1921 and thereafter. The district court concluded:

> The unamended bottlers have failed even to allege damage beyond pressure to sign a new contract. They have not

alleged damages to either the trademark or the formula. In terms [sic] other words, plaintiffs have failed to allege or prove damage to the res of any alleged trust.

*Id.* at 713 (footnote omitted). The district court also held that any type of equitable relief was inappropriate:

> The Court may only invoke its equity powers when there is no adequate remedy at law. The plaintiffs assert that the Court should use its equity powers because the Company played hard ball by using the introduction of diet Coke as leverage to persuade them to enter into contracts which would require them to pay more for syrups.
>
> Plaintiffs have an adequate remedy at law, however, because their contracts imply a duty on the part of the Company to deal with them in good faith. If the Company has acted in bad faith toward the bottlers, they have a cause of action at law for breach of contract. The bottlers for tactical reasons dismissed with prejudice their claim against the Company for breach of its duty of good faith and fair dealing. The Court will not create a fiduciary duty or confidential relationship where none exists so that plaintiffs, who for their own reasons chose not to pursue their legal claims, can revive their good faith and fair dealing claim under the guise of equitable claims.

*Id.* at 713–14.

The bottlers' fiduciary theory depends on whether the Company held the trademark

---

court is to consider this opinion and the issues determined by it ... under the law of the case doctrine," followed by a cite to *Todd & Co.*, is not to the contrary. In *Castle* we were not concerned with a court of coordinate jurisdiction but instead were instructing the district court on the meaning of a court of appeals' mandate. *See Cowgill*, 832 F.2d at 802. District courts must follow a court of appeals' instruction concerning treatment of an issue on remand even if the court of appeals has left the ultimate issue undecided.

**20.** We note that the first district judge granted judgment in the Company's favor on the trademark claims "subject to the limitations set forth earlier in this section concerning the plaintiffs'

interests in the trademarks." *diet Coke V*, 696 F.Supp at 130. Only the Lanham Act claims were before the district court in *diet Coke V*. Thus, the court did not then rule on the bottlers' common law trademark rights under their contracts.

**21.** Since we do not rely on any of the statements the Company makes in its brief in the recital of facts, we need not address the unamended bottlers' rebuttal to those statements in their reply brief. *See* Reply Brief of Appellants at 20–22.

Likewise, because we hold that the law of the case doctrine did not apply in the first place, we need not decide whether the second district judge properly invoked an exception to that rule.

and the secret formula in trust for them. They contend that "the Decrees and contracts create just such a trust relationship in this case [because] [t]he Company holds 'legal title' to the trademark 'to protect the Company *and* the bottlers.'" Brief of Appellant at 43 (quoting *diet Coke V,* 696 F.Supp. at 128). According to the bottlers, a violation of this fiduciary duty occurred when the Company withheld diet Coke syrup, which the preclusion order and admissions show included the Company's secret formula for Coca–Cola and the trademark for that soft drink, to pressure the bottlers into a new contract that raised the price of Coca–Cola syrup for them. Specifically, the bottlers argue that the Company deliberately and cynically planned the fanfare accompanying its introduction of diet Coke with minimal notice to the bottlers in order to create a consumer demand for diet Coke so enormous that the bottlers would be forced to sign separate contracts for diet Coke syrup on terms less favorable than those in the pre-existing contracts under which the bottlers operated.

The Company is quick to note that the unamended bottlers do not attack either the district court's finding that the parties bargained at arms-length, that they did not repose any trust in the Company, or that the Company never intended to create a trust for the bottlers' benefit. The Company acknowledges its contractual duty to treat the unamended bottlers fairly and in good faith and argues, because it met that obligation, the district court correctly refused to find an express trust or to create a constructive one through its equitable powers because the bottlers had an adequate legal remedy under the Company's implied contractual duty of good faith.

We agree with the district court and the Company that the bottlers' arguments fail to relate the legal precepts they cite to the facts of this case as the district court found them. It is accurate to say that a trustee may also be a beneficiary. *See* Restatement (Second) of Trusts § 99(2) (1959) ("One of several beneficiaries of a trust can be the sole trustee of the trust."); *id.* comment b. It does not follow, however, from that proposition, that the Company is a trustee of a trust that has both the Company and the bottlers as beneficiaries. To succeed, the bottlers must demonstrate that the district court's predicate conclusion that no trust exists is in error. They have not done so.

That conclusion is dependent on the following critical findings of fact which the bottlers do not challenge:

168. Plaintiffs' theory that the trademark is the res of a trust held by the Company as trustee for their benefit overreaches. The language dealing with the trademark in the Consent Decrees and the unamended contracts does not express in definite terms an intent on the part of the Company to subject itself to equitable duties as trustee to deal with the trademark for the benefit of plaintiffs. In other words, the language of the Consent Decrees and the unamended contracts does not give rise to an express trust. Restatement (Second) of Trusts, § 23 at 66; *id.* § 2 at 6.

\* \* \* \* \* \*

171. For the same reasons the Court found no express trust, the Court also finds that no resulting trust in the trademark arises from the Consent Decrees and the unamended contracts. The Court finds that the rights created in and the obligations imposed upon the Company and the bottlers with respect to the trademark were conferred in the context of compromise and negotiation and were intended to create a bilateral business relationship with respect to the mark. There is no inferred intent that the Company hold title to the trademark as a trust res for plaintiffs' benefit. Consequently, the Court finds the Consent Decrees and unamended contracts do not give rise to a resulting trust in the trademark for the sole benefit of the bottlers.

172. Furthermore, the negotiations leading to the Consent Decrees evince no intent on the part of the Company to hold the trademark in trust for the sole benefit of the bottlers....

\* \* \* \* \* \*

174. Paragraphs 8 and 9 of the Consent Decrees, whereby the parent bottlers conveyed to the Company whatever interest in the trademark they might have acquired, including the right to control and initiate litigation, in return for a perpetual and exclusive right of use, appear to be the result of the usual give-and-take bargain associated with any contract. They do not indicate a conveyance of sole equitable ownership of the trademark to the bottlers. Such a construction would render the conveyance of the parent bottlers' rights to the Company superfluous and nonsensical.

175. Consequently, the Court finds no inference that the parties to the Consent Decrees or the unamended contracts intended to create a trust whereby the Company undertook fiduciary duties and held legal title in the trademarks for the sole benefit of the bottlers.

*diet Coke VII,* 769 F.Supp. at 700–01.

Faced with the district court's finding that the Company did not hold the mark and formula in trust solely for the bottlers, the bottlers now contend that the Company held the mark and formula in trust for both itself and the bottlers. This change of viewpoint is of no help to them in the context of the district court's findings. Read in the context of this litigation as a whole, it is plain that the district court rejected the imposition of any fiduciary duties on the Company. It limited its obligation to the contractual duty of good faith and fair dealing. It found the relation between the Company and its bottlers was one of contract, not trust. Thus, in Finding of Fact No. 175, it preceded its statement that there was no trust for the "sole" benefit of the bottlers with the statement that "the parties did not intend to create a trust...." Our examination of the entire record and all the opinions of the district court convinces us that the district court treated the relation between the parties as entirely one of contract, not one of trust. We are satisfied that it was correct in doing so. Thus, the court also found:

167. Taking the trademark-related claim first, plaintiffs analyze the contractual relationship concerning use of the trademark as one in which the Company holds title to the trademark in trust for the benefit of the bottlers. Plaintiffs claim the Company breached its alleged fiduciary duty as "trustee" by using the trademark on another bottled product, thereby leveraging on the goodwill of the trademark and exerting pressure on plaintiffs to sign new contracts. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 1601–09 at 361–63.

*Id.* at 700. They are not entitled to another chance to litigate the trust issue by changing position from their initial "lone" beneficiary theory to a "second" beneficiary theory.

Finally, the district court also found that no confidential relationship existed between the parties which would allow it to construct a trust:

180. The Court agrees with [the first district judge's] assessment that the bottlers and the Company are arms-length bargaining parties and that the plaintiffs are "far from reposing in [the Company] complete trust and confidence...." *Coke VI* [, 696 F.Supp.] at 74.

181. Even if a confidential relationship at one time existed between the bottlers and the Company, the history of negotiations leading to the 1978 and 1983 Amendments, where these plaintiffs in particular questioned the Company's good faith at every turn, indicate that such a confidential relationship no longer existed in 1978. The bottlers were certainly not in a confidential relationship with the Company when diet Coke was introduced in 1982, by which time the parties were adversaries in the *Elizabethtown* litigation.

*Id.* at 702. Unquestionably, the district court found that the Company and the bottlers were business associates in a mutual-reliance relationship. It also found, however, that they were each capable of representing and preserving their own best interests during their adversarial periods, and therefore the Company owed its bottlers no more than the duty of good faith required in the performance of all contracts. *Id.*

The bottlers' observation that our scope of review is plenary regarding the application of law to facts does not help them. *See United States v. Contents of Accounts Nos. 3034504504 & 144-07143,* 971 F.2d 974, 978 (3d Cir.1992), *petition for cert. filed,* —— U.S.L.W. —— (U.S. Dec. 21, 1992) (No. 92-1106). The district court found that neither a trust nor a confidential relationship existed between the parties. The bottlers cannot avoid this finding by relying on the court's statement in *diet Coke V* that "[t]he Company holds 'legal title' to the trademark 'to protect the Company *and* the bottlers.'" Brief of Appellant at 43 (quoting *diet Coke V,* 696 F.Supp. at 128) (emphasis in original). That quote is taken out of context, as shown by the fuller statement:

> Furthermore, the correspondence among the parties at the time of the decrees reflects the reason for the language in paragraph 8: to protect the Company *and* the bottlers through eliminating uncertainties as to "legal title" for the purpose of infringement actions.

*diet Coke V,* 696 F.Supp. at 128 (footnote omitted) (emphasis in original). In context, the quote on which the unamended bottlers rely refers only to the function of the Consent Decrees in preventing litigation over title to the trademark. It is not even remotely connected with who the beneficiary of any alleged trust might be. The district court properly resolved the fiduciary issue by finding that neither a trust nor a confidential relationship existed between the parties, and concluding that the Company owed no fiduciary duty to the unamended bottlers.[22]

### V.

For the foregoing reasons, we will affirm the judgment of the district court.

---

22. Because we hold that diet Coke syrup is outside the scope of the bottling contracts and the Consent Decrees, we need not decide whether the Temporary Amendment, which effectively limited the Company's liability to the unamended bottlers in the event that diet Coke was covered by the bottling contracts and Consent Decrees, is enforceable.